Good morning, Your Honors. Gregory Latimer on behalf of the appellant Denise Wilkins. This is a matter that is before the court from the Eastern District of Virginia, which involved the death of a young man that was housed at the Central State Hospital. There are four areas assigned that we have claimed error that were committed by the trial court and that was with respect to the entry of summary judgment, the exclusion of plaintiff's expert witness, the denial of plaintiff's request to amend the complaint to add responsible parties, and the last was its granting of summary judgment with respect to the state law claim gross negligence aspect of the case. There were no undisputed facts in the case that would have provided a basis for summary judgment. I think that is undisputed. I mean all of the facts surrounding the death of this young man were undisputed. And if the would have been no basis for the summary judgment. The trial court excluded the plaintiff's expert because of the fact that the plaintiff had not fully complied with 2682 at the time of the notice of the date that he was supposed to disclose his expert. Now on that date, the plaintiff did identify his expert. The plaintiff provided the curriculum of his expert. The plaintiff provided the extensive list of cases of his expert and everything regarding that expert other than his report. The preliminary report was not completed until November 26th. The plaintiff inadvertently did not comply with rule 2682 as the court directed in the scheduling order. That is correct. The plaintiff did not fully comply. The missing aspect of it was the report. The missing aspect was the most important part, the opinions of the expert. And if you did not fully comply, then you did not comply. Well, I don't deny that. But I think that this court has indicated that the most important aspects of it are the curriculum viché and the qualifications of the expert. So you at least give the other side an opportunity to examine the credentials of an individual who is going to be. And what case is that? That is Carr. Surely you've got to have more than that if you're going to do a discovery. I mean, if not, you go on the web and cite and find somebody's opinion. You've got to tell them what he's going to say. No, no, no. I didn't suggest that, Your Honor. I wasn't suggesting that. What I'm saying is that those are very important aspects that this court has indicated. Because you do at least give the other side an opportunity to look at the credentials . . . He's qualified to give an opinion, but if you don't tell him, I mean, sort of the basis of the rule is to get an idea of how strong your case is. That's not going to tell you anything about your case. He could be the greatest expert witness in the world. I agree. But if his report doesn't help you, it doesn't mean anything. There was a preliminary report that was provided and then a subsequent much more elaborate report which far exceeded any of the requirements of the rules. And I think when we look . . . And when? What was the date of that report? The elaborate report, the report that contained everything and went through the detail was on December 21st. Tell me the posture of this case. I guess I'm having someone trying to figure it out. You had someone who was supposed to be watching him and she's watching TV, right? The person that was assigned to sit in a chair and look down the hall was watching TV. Nobody was assigned to watch anybody. Did you sue her? No, Your Honor. And then you had the one who was immediately over her who's supposed to make sure that person is watching down the hall, both of whom were found by some board or something to be negligent. Did you sue her? Well, it was actually a man and no. Did you sue him? No, sir. Why not? And then you . . . and Judge Greger's question is on my mind, too, so keep that one to bed. But then you do sue the hospital, but then you let them off. And then you sue Montgomery who, in fact, is not the head person to sue. She's like an assistant. So what's the strategy here? Well, let me explain. Let's talk about the real facts, the facts of these. And keep in mind, we're talking about the law of the state here, so you are not able to advance certain actions except under common law. And in others, if you're going to go you're limited. So fit that in. There must be a strategy here. I'm trying to figure out what it is. The hospital is let out because of the sovereign immunity claim, which prevents the hospital from being sued in the federal court based upon sovereign immunity of the state of Virginia, the Commonwealth of Virginia. So that's that. We talk about the nurse and we talk about the nurse's assistant, who was the person assigned to look down the hall. I know we're going there, but I want to make sure I understand the posture of it. So there's no state action. There is no claim based upon the hospital. There is a claim based upon the administrators under gross negligence. You can't bring an action in state court that even with sovereign immunity, if there's insurance, to the extent there's insurance, would be waived. Or if there are actions that are outside immunity where you could show it was malicious or intentional. Grossly negligent, which was a claim that was brought here. So that would be a state court action. That would be a state common law claim, yes. But you didn't bring a state action. There was no claim brought in the state court. Yes, that's what I'm trying to understand. Okay, that's correct. You can't sue them in federal court, but there's a reason. That's because the state has sovereign immunity. But your standard would have been the same under the gross negligence standard. So you could still bring that case in the federal court. It would simply be a gross negligence standard that you would bring, and that would be the state law claim that was brought here. So if you did bring it in state court, I take it they had no insurance, no liability insurance, there's no state tort claims act, anything like that, that would give waived immunity to the extent of that? Well, I'm not following that question, Your Honor. Typically, you can't sue a state actor because of immunity. But if the state itself seeks to have some form of insurance or have a state tort claims act, then you may sue to the extent that that exists. And I'm only asking. I don't know. I hadn't researched Virginia law. I'm a North Carolina kind of guy, so... But I'm just asking. I'm just wondering why you didn't... Was there... What the extent the state action was pursued, was there any state... If it said none, just say none. I mean, I'm okay with it. There was a state cause of action, but that was the gross negligence claim that was pursued in the federal court. There was no state court action pursued because it was our position that this was a case involving the custody and control of an individual which was better served under the constitutional claims. Once they took control of Mr. Davis... You wanted to be in federal court under 1983? Yes, sir. Oh, okay. Now, back to the facts. With respect to the nurse's aide that was supposed to be looking down the hall and with respect to the nurse that was looking down the hall, we did discovery in this case of the nursing supervisor who was the person responsible for assigning all of these duties and responsibilities to these people. And it was her position, as we set forth in the joint appendix, that she was not made aware of, number one, any threats that had been made against Justin Davis, number two, as to any orders that had been issued that they were supposed to be separated, and number three, that either of those gentlemen presented a problem with respect to each other. Who are you talking about? What's the name? Spruill. Ms. Spruill, who was the nursing supervisor, who was the person responsible for designating these individuals to do this and was the person responsible. And as she indicated, she did not even become aware of the threats until after the death that occurred. So when that was the whole point of this, when it was indicated that these persons were supposed to be looking after these individuals and supposed to be looking out for these individuals, you can't do that if you don't know you're supposed to do that. No orders had been transmitted to these people. The only order that had been transmitted was that you were supposed to sit in this chair and look down the hall and alert us to any activity. Yes, they were not doing that job. They were watching TV when they should have been doing that. The supervisor of the individual who was supposed to be doing that was watching TV with her. So yes, that was. But they weren't the problem. The problem was a systemic problem, which was an institutional problem. And the reason that Ms. Montgomery was sued, Ms. Montgomery was the acting director at the time. Mr. Montgomery was the assistant director. Ms. Montgomery has served in just about every position. But you didn't sue the institution. You sued Montgomery individually. We sued Montgomery individually. That's correct. Once we discovered that Montgomery was the assistant director as opposed to the director at the time, we sought to sue the director. The director, Mr. Davis, had been there with Ms. Montgomery, but as the record indicates, Ms. Montgomery was the person actually responsible for the day-to-day operations of the hospital. Ms. Montgomery, as she testified in her deposition, was responsible for, as she said, running the hospital. Ms. Montgomery, as she testified in her deposition, and the other administrator, Mr. Davis, had a nondelegable duty to assure that the safety of the individuals, that there was a safe environment provided for the individuals in the institution. Well, what you're trying to do is establish supervisory liability under 1983. That is absolutely correct, Your Honor. I take it you have to agree that, at least in our circuit, the Shaw case is the one that controls that, the analysis of that, and it gives you three different prongs to look at. How does your client, how do you satisfy those three prongs? Well, they had notice. They clearly had notice because for a week preceding the death of Mr. Davis, Not they, the one you sued. Well, she was the administrator. You sued Ms. Montgomery. Well, when I say they, I'm speaking of Ms. Montgomery, the administrator. Ms. Montgomery and Mr. Davis. That's exactly who you sued. That's correct. Where in the record is there indication that Ms. Montgomery had notice of the issue here? Well, the indication in the record was that any time there was an incident or something that occurred where there was seclusion or violence between inmates, that was prepared, and a report was prepared on a day-to-day basis. And that is in the joint appendix where we talk about that. And that is, there's a meeting that is held every morning at the institution where that report is discussed and everyone is made available of it. Now, they concede Where was their report discussed about this particular issue with these patients at a meeting in which Ms. Montgomery was present, or that she saw the report at all? Where is that in the record? Well, specifically about who was at what meeting and what day is not in the record. What is in the record is that the meetings are held every day. Those meetings were held at the time. The period we're talking about is February 19th through February 27th. There were meetings held every day. Those reports were prepared every day. And those reports were made available to the administrators during that period. The only claim that the defendants make is that Ms. Montgomery was typically off on certain days. And therefore, she did not see the report from February 25th, which was the report where there had been a physical attack by Mr. Phillips upon Mr. Davis, preceding the murder which occurred on February 27th. But up until then, from February 19th until then, there had been an escalating pattern of violence that was being exhibited by Mr. Phillips towards Mr. Davis that was reported in those reports. And based upon the testimony of the witnesses and the evidence presented, those reports would have included that information. And in fact, the daily notes of the nurses did indicate the threats, the escalating violence. And in fact, Dr. Duarte, who was one of the people who was involved, had been specifically informed of the threat by Mr. Phillips upon Mr. Davis. And that was information that was passed along to Dr. Yerotha. That was information that Dr. Yerotha indicated he passed on to the forensic team. That was information that Dr. Yerotha testified was something that would have been presented to the administrators during that time, and that threat that he was going to snap his neck. Right. And you know, in that entire recitation, I didn't hear you mention Ms. Montgomery. When you say I don't mention Ms. Montgomery, when I speak of the administrators, I'm talking about Ms. Montgomery and Mr. Davis. Those are the administrators. They're only two. The director and the assistant director. The administrators are Ms. Montgomery and Dr. Davis. Those are the two people who convened the meeting. Those are the two people with whom these matters were discussed. And so, you're right. I don't mention that, but I do say administrators, and that's how I'm using that term. You don't mention her because you only sued her. Well, that's not what we... We sued her, and we also attempted to bring in the other responsible parties. Dr. Davis and Dr. Yerotha. And we were prevented from doing that. But it was the timing of doing it. Well, no. The judge didn't... I don't think the timing would come into it, because I think that, as the Supreme Court indicated in Krupsik, I believe it is, it's not the timing that controls an amendment. What controls is whether or not these individuals knew or should have known during a particular period of time that they would have been named but for a mistake. So it's not the timing, and I don't think, even if that were the case, that the timing would be the issue in this case, because the timing was not that long after the case was initiated. In this particular case, after discovery was conducted, after the facts became clear that these were the responsible parties and these were the parties that should have been there, that's when we moved to amend. The trial court did not indicate that. The trial court simply said that it would be futile, because it didn't relate back. And I submit to the court that it would relate back, because these individuals clearly knew or should have known that they would have been named as defendants in this case, but for the mistake. Which is exactly what the case law teaches. I mean, the argument here was, well, they didn't know because they didn't have notice. This court, in practice here, I mean, this court may be acknowledging . . . If they didn't have notice, is it the notice of the fact that there was something that happened? I mean, that sort of triggers a statute of limitations. I mean, at some point in time, you've got an act that occurs, but then if you don't know about it until years later, you can't come in and sue someone. But that wasn't the issue of notice. I mean, clearly they knew about it. I mean, they were there. Dr. Yerotha was the doctor on the unit. Dr. Yerotha is still the doctor at the particular unit today. They didn't know about the lawsuit until after the statute of limitations had expired. That is what the claim of the defendant is, yes. That is the notice that they were arguing. But that's, again, when you look at the case law, I mean, as this court . . . And it made the analogy in practice there. If service upon the Attorney General of the United States constitutes service upon all of the agencies of the United States and its officers, clearly service upon the Attorney General of the state of Virginia would constitute service upon all of its agencies and its officers. How many months after the incident was the lawsuit filed? Twenty-three, I believe. Twenty-three months? Right. All right. During that time, the twenty-three months, was there any, I call it, self-help discovery? That is, it's your client's loved one who died. Say, look, I want the records about my loved one. Just say it. You know, basically get them.  And there was some discovery that was done. But I don't know if it was a self-help discovery. Pre-trial type stuff. Yes, sir. In cases like this, that's the best discovery. Because you say, look, that's my loved one. I want everything on all their records. Yes, sir. And I don't know the context or the extent that it was done. But there was a redacted investigative report that was provided. Not a redacted . . . That was one of the problems. The redacted investigative report had information about the incident. But it had the names that were redacted. And certain other personal information that was redacted. So that . . . How did you become involved in the cases? Previous counsel, apparently someone was involved initially. And then you came in. Yes, sir. Was that like just before the lawsuit was filed? A few months before, yes. The lawsuit was filed February 27, 2012, wasn't it? According to the docket? Yes. All right. And he was killed February 27, 2010. So that's 24 months exactly, right? That is the two years statute of limitations. It's not 23 months. I'm sorry. Okay. It's 24 months. All right. 24 months. That's pretty . . . So the last . . . I'm sorry. The last day. I'm sorry. I miscounted. Because the thing is that it seems to be . . . To this day now, do you know who wrote the order? Because that's how hospitals work. They work through orders normally. Who wrote the order that says someone should be watching the corridor to make sure this person does not leave and do harm to someone else? We deposed Dr. Urratha. And Dr. Urratha says that he believes that he did . . . There has been no order that has been identified or located wherein such an order exists. In their hospital records, did they have even an order that there was order? There was no order that was provided to the plaintiff, even though we specifically asked for it. Dr. Urratha was specifically asked about it, and he did not know where that order was. He believed that he had done it. He wasn't certain, but he didn't know where it was. That was the problem. They claim that all of these things were done. EOS, VOS, which is certain things that were ordered. But they did not . . . There was no specific orders where the nursing staff was asked to do this, or anybody else was asked to do that. Did you do 30B6 deposition? Yes. We did a 30B6 deposition as well. And you still couldn't reduce someone who knows about those things? Because that's what you do. You say, listen, I want the person, whoever it is, can tell me why was the lady even assigned. We didn't do that? We deposed the doctor who would have written the order, at least from our understanding. We deposed the nursing supervisor who would have been the person who would have . . . 30B6 is different. You don't have to name anybody. You just say what I want the category, and they have the onus on them to present the person. Exactly. And I was just explaining who else we . . . And we did a 30B6 person, and they produced that individual. And they produced some of the policies of the hospital with respect to what can occur, what actions they could have taken, such as one-on-one monitoring and other things. But nothing was produced. No one could identify or locate any specific document relating to a specific order that was written by anyone concerning what type of nursing monitoring they were supposed to have other than the general EOS, VOS, that type of thing. So, specifically, one-on-one monitoring, which is what Dr. Yerotha had indicated that he did, there was no physical evidence of that other than he thinks that he did it. And so that was one of the reasons that when the expert was asked to look at this, and he looked at this, he said that the record was completely devoid of information that should have been there, and that's why he considered this matter one of gross misconduct, gross indifference, and gross negligence. And I see that my time is up. I just have one question before you sit down. I must have heard you incorrectly. The case that you cited, the Fourth Circuit case that you cited as support for your position that your expert disclosure was good enough, what was that again? I must have misheard you because I don't see it in your briefs. Carvey Deeds? And I didn't say . . . It's not in your briefs? Give me the cite then. The case that we cite for . . . The one that's right there. What's the cite for that? 453 after 593. But it's not in your briefs, is that correct? No. And the reason for that is I looked at that. That was a panel in which Judge Wynn was sitting on. And that was a case where they looked at the expert disclosures in that case and they made a finding that they weren't sufficient because of what had happened and how convoluted the response had been and how in actuality there was an attempt by the plaintiff not to disclose based upon the failure of the defendant not to have disclosed. And it was a year later. And they talked about in that case how even after this issue was raised there was nothing done. Whereas in this particular case, by the time that the court had ruled with regard to the expert, the plaintiff's expert disclosures had been fully made, all of the information had been fully supplied, there was no scheduling order in place and there was no trial date set. And so when you look at the five factors with that in mind and you look at the five factors set forth in southern states, then none of them would have had any applicability and there could not have been any finding of harm because the court had none of that in place. There was no surprise because on the day that it was due, the expert was identified, all of the information regarding his educational background and things were provided. And like I said, the court had no scheduling order or trial date in place at that time. So there was no basis for harm. And that is an exception. When you're talking about this, you have to take it in contact. We filed a motion to alter or amend, pointing out to the trial court that it had not even made an assessment of those five factors. I was more interested in the fact that you were arguing a case that was not your briefs. Okay. Thank you, Mr. Latimer. Mr. Gilbody? Thank you and may it please the court. My name is John Gilbody. I'm with the Office of the Attorney General of the Commonwealth of Virginia. I'm representing Vicki Montgomery in this matter. And I want to talk first about some of the factual issues, I guess, that just came up. I think the most striking was, and I think it was a mischaracterization of the record and what the court has before it, Ms. Montgomery, my client, was one of two assistant directors at Central State Hospital at the time this happened, on February 27, 2010. Charles Davis was the director. There was an affidavit supplied by Ms. Montgomery in support of a motion. It's at JA 47 through 49, actually 50, and it indicates what her responsibilities were at the time. And they were primarily administrative in nature. She dealt with paper flow issues. That's what she indicates in her declaration. I'm sorry, I said affidavit. And that's what she did to suggest that she was running the hospital is simply incorrect. She does, in fact, now run it, and she ran it when suit was brought, as the court noted, exactly two years after the incident occurred, on the last day in which this case could be filed. And perhaps that explains why she was brought as a party defendant. But at the time this occurred, she was one of two assistant directors. And there's no org chart or any type of line that you can draw between what happened on the evening of February 27 and the very unfortunate and tragic death of Mr. Davis when he was murdered by Mr. Phillips. But there is no line between those individuals and Vicki Montgomery that the plaintiff has been able to draw here. Horrible set of facts. And I can imagine no greater loss for a mother. Horrible set, no question. One individual who's charged, whose duty is to look down the hall, monitor, you know there's a BLS report out, you know of the prior incidents here. She's looking down there, and instead of doing that, she's watching TV. And that is correct. And the one who's supposed to make sure she's doing her job, she's watching TV. And the hospital makes this internal investigation and says, both of these folks are negligent. Right, and what I'm looking at right now, and it's a JA 379 and 380, this is a witness statement form, it's part of the record obviously, this is Essence Thompson, she was the forensic medical health technician, who was supposed to be sitting in the chair. And she... Is she immune from suit? Not, no. And actually to address, as a fellow North Carolinian, I can tell you about Virginia law now. Under Virginia law, we have the Virginia Tort Claims Act. For simple negligence, a claim can be brought against the Commonwealth for the actions of, in state court, for the actions of employees of the Commonwealth with a limit of liability of $100,000. Likewise, for gross negligence, gross negligence claims can be brought. That was 30 years ago, wasn't it? I can't comment on that. And I don't think the Attorney General would want me to say anything on that issue. I'm quite positive. In any case, what Essence Thompson points out though, in her statement, is she says, I was not in my post, which is up against the right wall, looking down the hall, at 2215, that's military time, when I did my checks, Ms. Davis was in his bed, I'm sorry, I'm not reading from the right part, but in any case, she says, I have no reason for not doing my other two checks. There's a bad case against these two people, but your point is, none of this is connecting Ms. Montgomery. Ms. Montgomery was in charge of paperwork at the time, and she was an administrator, and an RN. Now, there's a number of problems with the claim against her, both actual and legal, in the sense that... Did she have any direct authority over these two individuals? None. Supervisory authority? No, sir. Even if she did, you're saying the three prongs on the show is not met for 1983? Correct. There's just simply... Well, let me address her a little bit more completely. She's an RN, but really, she's operating as an administrator of a hospital, and as we all know, when you have a hospital, you have doctors, and doctors have to make professional judgments. In this case, that would be Dr. Urratha. He had to make a professional judgment, and what he made, he made a professional judgment, and he put, among other things, he put George Phillips, the murderer, on violence observation status. He made that clinical determination. Is he immune from suit? He is not. Well, he is not immune, which is not to say that the statute of limitations hasn't already expired, and I'll get to that. But there's no immunity that he has from suit. And he was likewise... This all occurred at one ward, Ward 39 at Central State Hospital, which is the forensic ward where they have people who are being prepared or waiting for trial, and quite often there needs to be a determination made as to whether or not they're mentally prepared for trial. And that's his area of specialty for Dr. Urratha, as I understand it. And he made a clinical determination. So we can kind of take a step back from the whole thing. The claim here is deliberate indifference. He made a clinical determination, and indeed, in the appellant's reply brief, which I don't see... Ah, here it is. The appellant makes the point that... And I forget where. But the appellant makes the precise point that Dr. Urratha made a clinical determination to continue him on violence observation status even after he'd looked at all the information that was contained in the AOD reports, and those are the reports that Mr. Latimer referred to earlier that would be talked about every morning. In the context of deliberate indifference, a clinical determination was made, a decision was made, and that's what Judge Gibney below pointed out. I mean, starting with your claim, it doesn't work that way because they looked at this as what he calls escalating violence. In fact, there were... There were just a couple of incidents, at least in the AOD reports, and indeed, in the AOD report, the only one that Vicki Montgomery would have seen, this is from... The murder occurred on a Saturday, so there was less staff and it was a weekend. And as her affidavit indicates, she did not work Fridays at that time. So the way an AOD report works is you would... Whatever happens, for instance, on a Wednesday is then reviewed in the Thursday morning meeting. Likewise, whatever happens on Thursday is reviewed on a Friday morning meeting. Now, the only document, and this is JA-362, that's the only document that could possibly put her on constructive notice, and her testimony was she didn't recall whether or not she actually remembered having a meeting about this. She did recall some conversation about Mr. Phillips in her deposition testimony that's contained in the record. But the only thing that she would have possibly seen at all, at all, relating to these individuals who she's never met was, regarding Mr. Phillips, the patient reported feeling threatened by a peer. Justin Davis states he will not give him another warning  in a helicopter to a hospital. And then looking down on that same page relating to Justin Davis, it said, patient has been entering other patients' space today and has caused several patients to become angry. So what we can infer from that would be that Mr. Davis came in and bothered Mr. Phillips and Mr. Phillips got angry about it. That's the only document, the only document that she could have, in any reading of the facts before this court, that she could have been aware of. There's a lot of hyperbole in the briefs that have been filed by the appellant, but there's no substance, there's no factual foundation for any of that. In point of fact, she just didn't have notice and she was fulfilling her role as an administrator at the hospital at the time. And in that respect, summary judgment was appropriate as to Ms. Montgomery. Dealing with the second issue, the expert issue, the timeline there is pretty straightforward. Originally he was supposed to be designated by October 21 by agreement of counsel, that would be me, we extended that to November 21, 2012. Now, on 2012 I received a designation without a report. Apparently Dr. Voskanian wrote a two-sentence report on November 26, and I have that report. And in the report he says, per your request I have reviewed the materials forwarded to me from your office, including, and then he lists six different things that he's reviewed, and he says, That's it. What's wrong with that? That doesn't provide me any... That's exactly what happened in this case. You didn't watch the man. You were on notice that it was active homicidal ideation from someone. Say, listen, somebody's going to leave here in a helicopter, a medevac, and you didn't watch him so that you left the person vulnerable that is seated, and that breached the standard, and by my opinion as an expert within a medical reasonable certainty, that lack of supervision is the basis, is the causal connection, and it is . . . What else do you want? Well, I want to know how it's possibly relevant to Vicki Montgomery. It's not because she's someone that led in the line that should have been responsible for the supervision. Supervision is the key word. Right, but the point is, I don't understand. From reading this report, I have no idea where Vicki Montgomery, what her role, if any, was in . . . Because, again, I agree that . . . She's an RN, correct? She's an RN, correct. I just conceded that she received these reports every morning. And what I conceded was she would have seen . . . Is that correct? Yes, sir. Therefore, that puts her in the line of her professional judgment, making actions and determinations based on what is reported to her daily, and therefore it puts her in a supervisory line, and they found that to be wanting, and beneath the medical standard, causing a person to die. What else do you want? Well, first of all, I guess I'd want an explanation of . . . Because Dr. Urratha, a medical doctor licensed in the Commonwealth of Virginia, made a determination. She can't overrule that. That means somebody else also is also the supervisory. That doesn't mean that it's not sufficient. In other words, you're saying that maybe somebody else should be sued. And I agree, somebody else should have been sued. But that doesn't mean that the person that he's not focusing on, the defendant, is not in the supervisory chain. This is not somebody that sawed off the wrong leg. This is someone that did not supervise appropriately, and that's all you can say as a medical expert, that the supervision falls short. Because you are an RN, a licensed medical provider in the state of Virginia, and I am a Virginian, and then you, as a direct cause of relationship to that, you allowed a person to die when the man said, I'm going to kill someone. But what would be lacking there, Your Honor, would be the knowledge that what is being ordered, the violence observation status, is not being followed. And there's no question, but there's no notice to Vicki Montgomery of that. The point is, there's no question. I thought you said she got the one that said something. No, no, no. I'm sorry. I think I misspoke, Your Honor. What I'm saying is that the people who were supposed to be observing were not observing. We know that. Okay, that's boots on the ground. Right, but the point is, she had no way of knowing that they wouldn't do their job. There's nothing in the record. Nothing in the record. Basically, it almost seems like it's a res ipsa case that needs to be brought in that kind of passage against the right kind of folks, because I'm not sure you need an expert witness that noticed someone watching TV when they're supposed to be watching the hall. Well, in her own statement, she said, I have no excuse. I mean, she was supposed to be doing . . . And the thing is, there's no way . . . Your defense is centering on who it was that was sued. You say she was an administrator in that administrative person. And even when the reports were given, she wasn't there when this particular report came out. She might have been on notice generally, but you've got a hospital where you've got all kinds of threats because of the nature of where she is. That happens probably a lot. And she has to rely upon the clinical judgment of the physicians in the various wards. This is Ward 39. There are a number of wards in a place like this. And you'd be holding her to a standard of, if anyone doesn't do their job, either . . . But here's the difference. Maybe I'll make myself plain. What I'm saying is this. You're conflating something different. The question here is, was it error not to allow the expert's report? Now, in cases . . . Cases have building blocks. Now, ultimately, you're right. We're going to have to prove as to Respondent Superior or as to Montgomery. But one building block is, let's show that there is a violation of the medical standard that happened. And then next, connect her to that violation. But how do you throw out the expert opinion just because it doesn't do all things that are necessary to prove liability against this defendant? That's a different question. Because you could, for example, be the doctors at fault and those things. But that expert opinion . . . Because you don't have to be a doctor in 1983 necessarily to be liable, ultimately. Correct? Do you agree with that? Therefore, so as to the expert opinion, it may not go to the gravamen of the medical problem. But when you connect that finding, as they want to do, that it was a violation of the standard to what she should have done and didn't do, that becomes a link. But that doesn't mean you throw it out because that wasn't sufficient. Well, you have to show relevancy and reliability. It's not relevant that there was a violation of the medical standard of supervision and causing death to this case? What's not relevant is how it shows . . . how that links Vicki Montgomery to anything. That's for a trial, isn't it? Well, no. Some things you don't need an expert. It may not require that. I got a report that they were supposed to do that and I just looked away and did nothing. And I would submit, and perhaps we'll have to . . . well, perhaps we disagree, Your Honor, but I think that the report that I read to you is insufficient as a matter of law. It doesn't tell me . . . put me on notice of which facts he relied upon and it doesn't provide me fair notice. And moreover, because it wasn't a sufficient report, I didn't have an opportunity to take his deposition as counsel has repeatedly admitted because under rule . . . what is it? Under rule 26B4A, you're not allowed to take a deposition of an expert until you have their full report. And I didn't get that. And just so we're clear on the timing, the final report that was provided was provided on December 21st, 2012. And that was the day . . . that was the final day for discovery, the final day for dispositive motions, and the final day for motions to exclude experts. And at that time . . . at that point in time, when the report was filed, I had actually already filed a motion to exclude Dr. Boskanyan because of that two-sentence report that I believe and continue to believe was insufficient as a matter of law. The final issue . . . well, there's two final issues. The gross negligence . . . and I'll just be very brief. The only case that's cited by plaintiff on that issue is the Delt case where someone . . . where a hospital took custody of someone. That's completely different than what we have here. We have a case against Vicki Montgomery individually. There's no duty . . . there's no common law duty that Vicki Montgomery owed to . . . to the plaintiff's decedent in this case. As unfortunate as that is, there's simply nothing . . . no direct duty that she had. The final issue is the motion to amend. And, there's a statute of limitations issue that seems pretty clear. The statute ran on February 27, 2012. Now, the only issue before the court then is notice. Under the Goodman v. Praxis error, which I think counsel and I agree is the controlling Fourth Circuit case, and we both extensively relied upon that, the standard is they had to have notice and both Dr. Urratha and Dr. Davis indicated in affidavits. Dr. Urratha became aware of the lawsuit on November 8, 2012 according to his affidavit and that's at JA-260. And, in his deposition testimony he also indicated this and that's at JA-505. Dr. Davis didn't become aware of this lawsuit until 12-28-2012 and that's at JA-259 and in his deposition he indicated that at JA-467-468. Now, they did not have notice. There's no evidence to the contrary. That's an established fact in this case. They didn't have notice within the statute of limitations period or, as the rule says, the time for service under Rule 4M which is an additional 120 days after the two years. So, there was simply no notice to either individual and the cases... They were sued. The doctor's been on the ward the whole time. Correct? And still is today. Dr. Urratha is. Yes, sir. He didn't know that Central State was sued? No, sir. He was... To understand that, and I see I'm out of time almost... I'm asking you a question, so you're okay. Thank you, Your Honor. There was a suit against Vicki Montgomery in her individual capacity that was served upon Vicki Montgomery. The suit against Central State was actually served upon the Commonwealth of Virginia, actually the Office of the Attorney General. And because there was 11th Amendment immunity for Central State Hospital and the Commonwealth, there was a dispositive motion filed in response, a motion to dismiss in which point the plaintiff filed an amended complaint removing Central State and the Commonwealth of Virginia as party defendants in the matter. So, no, he never saw it. Was there an investigation in this matter? The doctor involved wasn't given any notice? No, sir. The lawsuit was against Vicki Montgomery in her individual capacity. And, I mean, without getting into that whole discussion, but, Your Honor, he had no notice. And I can imagine... I wasn't the first attorney involved in this lawsuit, but I can also imagine that by the time the lawsuit was filed, Vicki Montgomery was the director of the hospital. I would imagine it's not something she necessarily wanted to share with...it's not something one wants to share if one is in a leadership position. I imagine...I don't run hospitals, so that's my assumption, but I have no idea. All I know is that the testimony is very clear. He had no notice. Ms. Montgomery is being sued individually. Yes, sir. The State of Virginia, through the Attorney General, represented in the hospital, got them out. So why are you representing her? Because I'm representing her as an employee of the Commonwealth of Virginia. In her status as an employee because the liability that can flow from this could be... Well... Well, it has to do... You mentioned insurance before, and there's a difficult question. And did you give... Did you let them know what they all... Give them all of the records? They had all the medical records, to my knowledge, and one of the first things that Mr. Latimer requested was an unredacted version of the report that he mentioned earlier, and I gave that to him as soon as he asked. The report of what? There was an investigative report, and it's actually found in the record. I'm not talking about the report. I'm talking about all of the medical records that pertain to this situation. You didn't give them... My understanding was that he already had those. And keeping in mind... Well, there was a bit of an issue with that below where I understood that he had all the medical records and that he wanted the investigative report, an unredacted version, which we gave him with an agreement. And my understanding... So it's not clear to me. There was a request for documents at one point, and I objected because Vicki Montgomery as an individual could not provide the documents, and I indicated to counsel that he should... If he wanted the documents, he should subpoena them, and I would work with him to get them, but that subpoena was never forthcoming. I don't know that that has any relevance simply because my understanding under Virginia law... Well, I know under Virginia law you are able to obtain copies of medical records by statute. So you can go directly to the health care provider for that. You don't have to ask opposing counsel. That's what I was alluding to about you just giving... Right, and he would have had all those records or have access through Virginia's statutory means or through subpoena. I just had one more, just puzzling somewhat. You mentioned the State Tort Claims Act limits it to $100,000, but I take it the hospital had insurance, or does it? Well, what I was alluding to earlier, and it's not exactly insurance, and I hate to use that to answer with not exactly, Your Honor. It's covering stuff that's not covered by the State Tort Claims Act. There's a risk management plan that is administered by the Commonwealth. So it's much like that. It quacks like a duck, but it's not quite a duck. I got you. All right, with no more questions, thank you very much. Mr. Latimer, you have some time reserved. Thank you. If I could just briefly address the issue of Ms. Montgomery and her responsibilities. Now, the issue has been, I guess, they've made this statement that Ms. Montgomery only had administrative responsibilities. There was an employee work profile of Ms. Montgomery, and it's at 146 to 154 of the joint appendix. And her responsibilities are spelled out. And beginning on page B, it talks about 25% of her work is administrative management, provides direction, oversight, and administrative supervision to the Office of Medical Affairs, the clinical department managers, and the director of forensic services. 25% of her duties were operations, leads and directs the planning, implementation, integration, and management of all clinical and administrative operations of the hospital, ensuring the support of the mission, values, vision, and strategic plan. 15% was hospital management, represents the hospital director in his absence relative to clinical matters, assists the hospital director with a variety of special projects designed to improve and maintain quality services for patients, hospital staff, and the general public. And then the rest of her work was special assignments. So Ms. Montgomery, and this was an argument, this was a situation that the judge looked at, and the trial court I'm talking about, and Ms. Montgomery was not just this person that they're trying to make to be an administrative person. She had direct oversight based on her performance appraisal, based upon what she was paid for. This was her responsibilities. They talked about they didn't have a right or discovery was closed when plaintiff's expert report, and that's just not true. If you look at the initial scheduling order in this case, the defendant wasn't even to name his expert until December 21st. The plaintiff then had a right to name rebuttal experts by December 31st. Depositions for experts could have taken place all the way through that time period. So when they say to you that the time for them to take the deposition, they didn't want to take the deposition of the expert. And what the plaintiff pointed out below was that you're claiming prejudice, but you never even sought to take the deposition, and then claim that you couldn't take it because you didn't have an expert report. You could have taken it when you got the preliminary report. You could have taken it when you got the whole report on December 21st. You could have taken it after you named your expert in the period between December 21st and December 31st. You could have taken it after December 31st, after the plaintiff was supposed to name his rebuttal expert. They didn't do it because they didn't want to do it, and now they're trying to use that as a shield and claiming that that is the harm. When they made their argument to exclude Dr. Voskanian with the trial court, the only thing they said the prejudice was was prejudice. That's it. Nothing else. When the plaintiff pointed out that they could point to no real harm in this, then they adopted what the plaintiff said, which was that they did not have a request to take the deposition and had been precluded from doing that by virtue of not having the expert report. So what we submit is that was a contrived harm that didn't exist because in this case, as I've said, discovery wasn't closed. In fact, their expert, the time for them to name their expert hadn't even passed, and the time for plaintiff to name her rebuttal expert hadn't passed, and depositions could have taken place. But most importantly, at the time that the judge precluded the plaintiff from doing this, there was no scheduling order in place. There was no trial date. There was nothing. Even if there were a harm, that was nothing to prevent it being cured. So when you look at the five factors set forth in Southern states, the expert should have been allowed. The expert opinion, the trial court said simply that we just can't have this because we put it forth in the initial scheduling order, and therefore we can't allow it. So you say it was an abuse of discretion? It was an abuse of discretion not only to do that, but courts repeatedly have indicated that trial courts or any court that fails to exercise its discretion abuses its discretion. And in this case, the trial court did not exercise discretion. It did not even consider the five factors of Southern states. And I submit to you that the reason it didn't exercise the five, it didn't exempt the five factors were because had it done so, it would have been constrained to find that the expert should have been allowed to testify. And with regard to Dr. Urratha and Dr. Davis, they relayed back. I mean, the Supreme Court, we are, I understand Praxair is an ombuds decision by this court, but I think that we are guided by the Supreme Court when the Supreme Court said in Krupsky versus Crozier that relation back under Rule 15c1c depends on what the party to be added knew or should have known, not on the amending party's knowledge or timeliness in seeking to amend the plea. And they looked at Praxair and they looked at a lot of other cases from a number of other circuits and Justice Sotomayor indicated in that decision that they were doing this in order to address the inconsistencies that were existing within the circuits regarding this relation back theory. And so there is no question that Dr. Urratha should have known that he would have been named in this suit had he probably been able to be identified. And Dr. Davis, clearly we intended, we identified the person that was responsible for the operations of the hospital, that is clearly Dr. Davis. Dr. Davis knew or should have known that he would have been here. That satisfies the requirement of Rule 15. The Supreme Court has said so, and I believe that this court came very close to saying so if it didn't. And it certainly made the analogy with a service upon the Attorney General of the United States, which would be applicable to this situation. So what we're saying is that the errors here, we're not claiming that we would have won at trial, but we're claiming that we should have been given the opportunity. And in this case, Ms. Montgomery was in that supervisory change. So was Dr. Davis. So was Dr. Urratha. And we're just asking that the court give us an opportunity to have this wrong redress. I want you to speak to this point. Council for the Commonwealth says that factually that only Ms. Montgomery could not have known anything factually about this threat other than, as he pointed out, that she's short of knowing about this violence in the context of her being off on Friday. Can you relate to that? Because all facts are to be given in your side, in your favor. So can you tell me what fact it would have been in the record would have said yes, she would have known of this active ideation? Well, I think that first we're looking at it through the wrong lens when we say that. Because it's not what she should have known. It's not what she did know. It's what she should have known as well. Well, for 1983 respondent superior, you got to have policies that would inevitably lead to this or some kind of active involvement. That's policies. But when you're talking about supervisory personnel, I mean, a supervisor can't say that my people were not performing their jobs and then you turn your head and say, well, I didn't know that they weren't doing it. I think that the standard for supervisory liability is what the supervisor knew or should have known. But in this case, in this case, what they knew was, I mean, the test... Oh, I'm sorry. What Ms. Montgomery knew was that Mr. Phillips was coming in, he was a dangerous person from the get-go. They knew that. They were about building 39 for residents. It's a very dangerous place. Well, but he was particularly dangerous. And Dr. Uratha testified that they had a meeting before he got there about the security that they were going to put in place for this man. She was present? She was present. They had a meeting before he got there. He was a patient when he came in. Where is that in the record? I believe it's at 182 to 193. All right. You said 182? 182 to 193, Dr. Uratha. Oh, okay. Okay. 94 is, or 93, is his entire deposition? No, not his entire. It's an excerpt. Okay. So where does he talk about Ms. Montgomery in there? I've just scanned it, but I didn't see her name anywhere. On 190, he talks about, and I guess we get into the question of when we're talking about administrators, that's what he talks about. Okay. So where the question says, and that should be provided to you and the administrators, that's where you're inferring that that was Ms. Montgomery? Yes. But the information that they had about him was about the dangerousness of the situation. And so Ms. Montgomery, as I said, would have had the reports. In addition to that, it is our position that because if you're responsible for the operations of the hospital because you take the day off, it doesn't mean that you are not aware of the situation of the hospital. And in this particular case... Let's hold it right there. Put a little thumb there. You're right. It doesn't mean you're not aware. You're a day off. But what is the evidence that she would have known that someone would be watching television the next day and not do their job? That's the question. Well, we had... First, it's not whether you had known that there was a... She would have known that there was no proper supervision. And this is why you know that. Because on February 25th, Mr. Phillips attacked Mr. Davis in the gymnasium. Now, you know that improper supervision was being conducted because of this. As Ms. Spruill testified in her deposition, he should have never been in the gymnasium. When you're on VOS, EOS, you don't go to the gymnasium. And he should have never been there in the first place. She knew... That's based on her knowledge from your inference that she was an administrator at the onset, knowing how dangerous he was. She knew already he was in the wrong place. Well, everybody knew he was in the wrong place. There was no question that Mr. Phillips shouldn't have been there based upon his status, EOS, VOS. He shouldn't have been in the gymnasium when the attack occurred. Assuming that now we're to a higher level now. We had to guard the corridor to make sure he stays in. Now, what then says that she should have known that that wasn't being done or could not be done? Well, see, that's the... That's the misunderstanding. There was no guarding. There was a person sitting down the hall looking down the corridor. There was nobody that was supposed to prevent there being contact between Mr. Davis and Mr. Phillips. There was nobody preventing Mr. Phillips from being out of his room. That person was just supposed to watch the corridor to assure that nothing happened in the corridor. That person did not have any directives to keep Mr. Phillips out of Mr. Davis' room. That person, presumably, if he had... What was seen, nothing happened in the corridor. This is in the record. Nothing happened in the corridor. What happened was that Mr. Phillips went into Mr. Davis' room on two occasions, and based upon the time that he went in and what occurred, and this occurred because there are video cameras that were monitoring the hall during the entire period, and Ms. Spruill testified that even though they had the ability to see whether or not active, that the orders were fulfilled with regard to monitoring, nobody ever looked at the cameras. But in this case, we only know that Mr. Phillips murdered him because he went in two times in the time of death as recorded. So even if they had been watching the corridor, nothing would have prevented Mr. Phillips from entering that room because they had never been told not to let those people there, and that is the problem. Your problem, based on what she knew, her position being an RN in a supervisory position, she should have written direct orders specifically related to his not being able to come out. Exactly, and the fact that you're an RN has nothing to do with it. As she testified, hospital is a building. People run hospitals. She was responsible for running the hospital with Mr. Davis, as she testified, and she also testified, notwithstanding what has been said here, she admitted that she had a non-delegable duty to provide a safe environment. She admitted that. This may not even be a medical malpractice case, really. It's not a medical malpractice case. This is a case involving dereliction of duties and the deliberate indifference of the people who are supposed to safeguard the safety of those individuals because they have deprived them of the right  Thank you, Your Honor. Thank you, Mrs. Latimer. We will adjourn the court for today and then come down and greet counsel. This honorable court stands adjourned until tomorrow morning at 9.30. God save the United States and this honorable court.
judges: Roger L. Gregory, James A. Wynn, Jr., Stephanie D. Thacker